IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE ADOLOR CORPORATION      :
DERIVATIVE LITIGATION          :     Lead Case No. 04-3649
                             :

**SURRICK, J.**                                **MAY** _/2_ **, 2009**

## MEMORANDUM

Presently before the Court is the Motion of Adolor Corporation to Dismiss Plaintiffs'

Complaint for Failure to Make the Requisite Demand. (Doc. No. 7.) For the following reasons,

the Motion will be granted.

## I.    BACKGROUND

Plaintiffs Robert Anderton and James Wilson, shareholders of Adolor Corporation

("Adolor" or the "Company"), bring this shareholder action on behalf of Adolor against its

officers and directors alleging claims of breach of fiduciary duty, abuse of control, gross

mismanagement, waste of corporate assets and unjust enrichment, and of misleading

shareholders as to the future prospects of its key product, Entereg.[1] (*See generally* Doc. No. 5

(hereinafter, "Compl.").) Adolor now moves to dismiss the Verified Consolidated Shareholder

Derivative Complaint (the "Complaint") for failure to assert well-pled allegations showing that

demand on the Adolor Board of Directors would have been futile pursuant to Rule 23.1 of the

Federal Rules of Civil Procedure.

---

[1] By Order dated May 8, 2009, in a related action, we dismissed securities fraud claims against various officers and directors of Adolor. *See* Order, *In re Adolor Securities Litigation*, No. 04-1728 (E.D. Pa. May 8, 2009). The Memorandum Opinion accompanying the May 8 Order sets out the background of the clinical trials and alleged wrongful conduct that forms the basis for Plaintiffs' claims here. *See* Memorandum, *In re Adolor Securities Litigation*, No. 04-1728 (E.D. Pa. May 8, 2009).

## A.    Defendants

### 1.    Nominal Defendant Adolor

Adolor, a Delaware corporation, is a developmental stage biopharmaceutical company that discovers, develops, and plans to commercialize products for pain relief. (Compl. ¶ 5.) Plaintiffs, shareholders of Adolor, bring this suit on its behalf.

### 2.    Insider Defendants

Bruce Peacock is the President, Chief Executive Officer, and Director of Adolor. (*Id.* ¶ 15.) During fiscal year 2003, Adolor paid Peacock $536,202 in salary and bonus compensation, and granted him 150,000 options to purchase Adolor stock. (*Id.* ¶ 85(c).) In his position as President and CEO of Adolor, Peacock was responsible for making the majority of Adolor's public statements at issue.

Michael Dougherty is the Senior Vice-President, Chief Operating Officer, Chief Financial Officer, and Treasurer of Adolor. (*Id.* ¶ 15.) During fiscal year 2003, Adolor paid Dougherty $356,000 in salary and bonuses and granted him 25,000 options to purchase Adolor stock. (*Id.*) Dougherty is not a director of Adolor. In 2004, Dougherty joined the Board of Directors of ViroPharma, Inc., where Defendant Claude Nash served as Chairman and CEO until 2002. (*Id.* ¶ 85(h), (I).)

David Jackson is the Senior Vice-President of Research and Development of Adolor. (*Id.* ¶ 17.) In fiscal year 2003, Adolor paid Jackson $414,336 in salary and bonus and granted him 43,200 options to purchase Adolor stock. (*Id.*)

### 3.    Outside Director Defendants

The Complaint names Adolor's seven outside directors as Defendants: Paul Goddard (*id.*

2

¶ 18); Claude Nash, who is a member of the Board's Compensation Committee (*id.* ¶¶ 19, 85(b));
Donald Nickelson, who is a member of the Board's Audit Committee (*id.* ¶¶ 20, 85(d));
Armando Anido, who is a member of the Board's Compensation Committee (*id.* ¶¶ 21, 85(b));
George Hager, Jr., who is a member of the Board's Audit Committee (*id.* ¶¶ 22, 85(d)); David
Madden, who is a member of the Board's Audit Committee (*id.* ¶¶ 23, 85(d)); and Robert T.
Nelsen, who is a member of the Board's Compensation Committee (*id.* ¶¶ 24, 85(b)).

### B.    Allegations of Wrongdoing

Plaintiffs' allegations of wrongdoing arise out of misrepresentations made by Defendants
concerning the development of Entereg that resulted in the artificial inflation of Adolor's stock
price. (*Id.* ¶ 40).

Beginning in 2002, Adolor put Entereg through a series of clinical trials before
submitting its New Drug Application ("NDA") to the Food and Drug Administration.[2] (*Id.* ¶ 41.)
Entereg was developed to treat a condition called post-operative ileus ("POI"), a serious
complication that occurs in connection with abdominal and other surgeries. (*Id.*) POI is a major
cause of post-surgical death for which there was no FDA-approved treatment at the time Adolor
introduced Entereg. (*Id.*) When Adolor began its clinical testing of Entereg, the potential POI
market was estimated to be over $1 billion. (*Id.* ¶ 40.)

---

[2] There are four regulated stages of new drug development. *See In re Viropharma Sec.
Litig.*, No. 02-1627, 2003 WL 1824914, at *2 (E.D. Pa. April 7, 2003). Phase I trials involve a
small, controlled trial involving human subjects and conducted primarily to determine the drug's
safety profile and dosage range. *Id.* In Phase II, the drug is tested on volunteer patients afflicted
with the disease to test its effectiveness. *Id.* If the first two phases are successful, the drug is put
through a final Phase III trial where the drug is tested on patients in clinics and hospitals. *Id.*
When Phase III testing is complete, the drug company files a New Drug Application ("NDA")
with the FDA. *Id.* After making its decision, the FDA issues one of three letters to the applicant:
an "approval" letter, a "not approvable" letter, or an "approvable" letter. *Id.*

Adolor's Phase III trial of Entereg involved four different studies, three of which tested Entereg's effectiveness on patients undergoing various gastrointestinal procedures.[3] (*Id.* ¶ 46.) These studies were to be "double-blinded," "randomized," and "placebo-based," measuring the time of recovery of gastrointestinal functions for patients at each dosage level. (*Id.* ¶ 47.) In addition, Study 302, Study 313, and Study 308 each measured Entereg's performance at 6 mg and 12 mg doses. During the Phase III trials, Adolor entered into a collaboration agreement with GlaxoSmithKline ("Glaxo") for the development and commercialization of Entereg. (*Id.* ¶ 45.) Glaxo conducted a study in Europe in hopes of gaining regulatory approval there. (*Id.*)

The essence of Plaintiffs' allegations of wrongdoing is that Adolor, through its officers and directors, issued a number of "improper statements" regarding the results of the Entereg Phase III trials. (*See id.* ¶¶ 49-80.) Plaintiffs contend that public statements regarding the results of the Phase III trials were false or misleading because Adolor and various officers and employees failed to disclose detailed information about study data when announcing and discussing top-line results. For instance, Plaintiffs allege that statements regarding the results of Study 313 were misleading because they did not disclose information regarding the results of different patient subgroups. (*See id.* ¶¶ 51-53.) Study 302 included patients undergoing simple hysterectomies, while Study 313 did not. (*See id.* ¶ 53.) Plaintiffs argue that this difference was material because, *inter alia*, "the mixed results within the patient subgroups for the 302 and 313 studies confounded the results, making it difficult for the FDA to approve an Entereg™ NDA

---

[3] The Phase III studies dealing with the efficacy of Entereg were labeled 14CL302, 14CL313 and 14CL308 ("302," "313," and "308," respectively), and were conducted and reported in that order. Study 14CL306 was done to test Entereg's safety and forms no basis for Plaintiffs' allegations.

based on the prospect of disappointing results from the prospective 308 study." (*Id.* ¶ 80(i).)

In addition to statements made by the Company (e.g., press releases and public filings), Plaintiffs identify specific statements and actions by Defendants Peacock, Dougherty, and Jackson that were false or misleading. (*See, e.g., id.* ¶¶ 51, 54-56, 60-61.) Other than statements made by the Company or by Defendant Peacock, Plaintiffs identify no specific statements or discrete conduct of members of the Board.

Plaintiffs allege that Defendants' wrongdoing resulted in Adolor sustaining "significant damages." (*See, e.g., id.* ¶ 97.)

### C.   Plaintiffs' Demand-Futility Allegations

In the instant Motion, Defendants do not contest, and we do not address, the legal sufficiency of the breach of fiduciary duty claims asserted against them derivatively on behalf of the Company.  Rather, Defendants challenge Plaintiffs' failure to make a demand on Adolor's Board of Directors to bring the action directly in the name of the corporation.  Plaintiffs concede that they did not make any demand on the Board to institute this action.  Instead they claim that such demand would have been futile.

Plaintiffs allege several reasons that making demand on the members of the Board as a group would be futile. (*See id.* ¶¶ 80(a), (h)-(j).)  Plaintiffs argue that making demand would be futile because each Defendant-Board member knew of the adverse non-public information as a result of their access to and review of internal corporate documents, conversations, connections with other corporate officers, employees, and directors, and attendance at management and Board meetings. (*See id.* ¶ 80(a).)  Similarly, Plaintiffs contend that the members of the Board, "because of their inter-related business, professional and personal relationships, have developed

debilitating conflicts of interest." (*Id.* ¶ 80(h).) Plaintiffs argue that because the Defendant-Board Members "participated in, approved and/or permitted the wrongs alleged [in the Complaint]" they cannot be disinterested. (*Id.* ¶ 80(i).) Plaintiffs also argue that because bringing a suit would require the members of the Board to sue themselves, demand is futile. (*Id.* ¶ 80(j).) Finally, Plaintiffs argue that all the members of the Board other than Defendant Peacock are eligible to receive stock options and that "[b]ecause of these lucrative stock options, any demand on [these] defendants . . . will be futile." (*Id.* ¶¶ 80(b), (f).)

In addition to claims that demand would be futile as to the Board generally, Plaintiffs identify several conflicts and issues that preclude individual Board members or members of Board Committees from being independent or disinterested, making demand futile. Plaintiffs contend that membership on either the Board's Compensation Committee or the Board's Audit Committee creates conflicts that prevent members of those committees from exercising impartiality in reviewing a demand on the Company.

Adolor's Compensation Committee – comprised of Defendants Anido, Nash, and Nelsen – is responsible for setting the executives' annual salaries, bonuses, and stock ownership programs. (*Id.* ¶ 85(b).) The Compensation Committee annually evaluates the performance of the CEO and other executive officers. (*Id.*) Because the Compensation Committee controls awards to the other Defendants, Plaintiffs argue that the remaining Board members would not institute this action against Anido, Nash, and Nelsen, thus making demand on Defendants Nickelson, Hager, Peacock, Madden and Goddard futile. (*Id.*) The Audit Committee, comprised of Defendants Madden, Hager, and Nickelson, is responsible for assisting the Board in monitoring Adolor's financial statements, and the Company's compliance with legal and

regulatory requirements. (*Id.* ¶ 80(d).) Plaintiffs allege that the Audit Committee recommended that the Board include certain improper financial statements in Adolor's Annual Report on Form 10-K for the year ending December 31, 2003. (*Id.*) By doing so, Madden, Hager, and Nickelson breached their fiduciary duties, making demand on them futile. (*Id.*)

Plaintiffs contend that demand on Defendants Peacock, Nelsen, Nash, Goddard, and Madden would be futile because of unique individual circumstances. Those circumstances are as follows:

- Defendant Peacock, in addition to his position as CEO and President of Adolor, is a director of the Company. (*Id.* ¶¶ 15, 85(c).) In 2003, Peacock earned $536,202 in salary, bonus, and other compensation, and was granted 150,000 options to purchase Adolor stock. (*Id.* ¶ 85(c).) Plaintiffs claim that Peacock lacks independence from Anido, Nash, and Nelsen, the members of the Compensation Committee, because they control his salary, leaving Peacock incapable of considering a demand. (*Id.*)

- Defendant Nelsen's private investment firm, ARCH Venture Partners, sold 22,000 shares of Adolor stock for $420,420, while Defendant Nelsen was in possession of material adverse non-public information. (*Id.* ¶ 85(a)(i).) Although Nelsen was not the beneficial owner of the shares, Plaintiffs claim that Nelsen received a personal financial benefit from this sale, making any demand on him futile.

- In January 2004, Defendant Dougherty joined the Board of Directors of ViroPharma Inc. (ViroPharma), where Defendant Nash previously served as Chairman of the Board. (*Id.* ¶ 85(g).) In August 2002, the Company entered into an agreement with ViroPharma under which ViroPharma agreed to provide clinical trial analysis, data management and reporting writing services for a total of five of Enterg Phase I clinical studies in exchange for $357,000. (*Id.* ¶ 85(h)(i).) Plaintiffs allege that the relationship between Defendant Nash and Defendant Dougherty stemming from their association with ViroPharma renders each unlikely to be impartial.[4] (*Id.* ¶ 85(g).)

---

[4] Plaintiffs' allegations regarding Defendants Dougherty and Nash are unclear. The Complaint alleges that "Dougherty lacks independence from Nash" and that "[t]his lack of independence renders Dougherty incapable of impartially considering a demand to commence and vigorously prosecute this action." (*Id.* ¶ 85(g).) Defendant Dougherty is not a member of

- Defendant Goddard was hired by the Company as a consultant in July 2003 to provide strategic business advice and related assistance to the CEO and management team. (*Id.* ¶ 85(h)(i).) Under the consulting agreement, Goddard was to receive quarterly payments of $8,500 and a stock option grant of 4,000 shares of common stock. (*Id.*) Plaintiffs allege that demand on Goddard would be futile because of the consulting agreement.

- Finally, Plaintiffs claim that demand would be futile as to Defendant Madden because, until March 2004, he was a director of Royalty Pharma AG, a private investment management firm specializing in the acquisition of royalty interests in pharmaceutical products. (*Id.*) Adolor licenses the compound that is the basis for Entereg from Eli Lilly and Company. (*Id.*) Under this licensing agreement, Adolor is required to pay Eli Lilly based on product sales. (*Id.*) In March 2002, Eli Lilly sold the right to receive a portion of these royalties to Royal Pharma AG. In connection with their public offering in November 2003, Adolor requested that the underwriters of that offering reserve 60,000 shares of stock to Madden at the public offering price, thereby reducing the total number of shares available to the general public. (*Id.*) Plaintiffs claim that as a result of these arrangements demand on Madden would be futile.

## II.    LEGAL STANDARD

Plaintiffs' claims are brought in derivative form on behalf of Adolor. "When shareholders bring 'a derivative suit on behalf of the corporation against the directors based on their actions or failure to act, there is a threshold question of standing as to whether the shareholders have made a demand on the board of directors.'" *In re Forest Lab. Derivative Litig.*, 450 F. Supp. 2d 379, 387 (S.D.N.Y. 2006) (*quoting Fink v. Weill*, No. 02-10250, 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005) (internal citations omitted)). Federal Rule of Civil Procedure 23.1 imposes a heightened pleading standard for shareholder derivative suits. To plead demand futility, a complaint must "state with particularity:  (A) any efforts by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the

---

the Board (*see id.* ¶ 16), and his impartiality is irrelevant to the inquiry of demand futility.

8

shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1. "Because Rule 23.1 requires particularized allegations, the pleading standard is higher than the standard applicable to a pleading subject to a motion to dismiss pursuant to Rule 12(b)(6)." *See In re Forest Labs.*, 450 F. Supp. 2d at 387. "When considering a motion to dismiss for failure to satisfy the particularity requirement of Rule 23.1, the Court accepts as true all well-pleaded allegations and all reasonable inferences drawn therefrom." *Id.*

## III.   LEGAL ANALYSIS

In *Kamen v. Kemper Financial Services, Inc.*, the Supreme Court held that "the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure.'" 500 U.S. 90, 96-97 (1991).  Accordingly, "federal courts hearing shareholders' derivative actions involving state law claims apply the federal procedural requirement of particularized pleading, but apply state substantive law to determine whether the facts demonstrate demand would have been futile and can be excused." *Kanter v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007) (*citing Kamen*, 500 U.S. at 98-99).  Adolor is a Delaware corporation.  (Compl. ¶ 14.)  Under 8 Del. Code § 141(a), the decision to bring a lawsuit on behalf of the corporation is ordinarily at the discretion of its board of directors.  *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (concluding that the board's "authority includes the decision whether or not to initiate litigation on behalf of the corporation"), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).  A stockholder has limited rights to prosecute derivative suits on behalf of a corporation. *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 366 (Del. 2006).  Those

rights are "limited to situations where either the stockholder has demanded the directors pursue a corporate claim and the directors have wrongfully refused to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute the litigation." *Id.* at 366-67; *see also Ryan v. Gifford*, No. 2213-N, 2007 WL 416162, at *7 (Del. Ch. Feb. 6, 2007) ("This demand requirement works 'to curb a myriad of individual shareholders from bringing potentially frivolous lawsuits on behalf of the corporation, which may tie up the corporation's governors in constant litigation and diminish the board's authority to govern the affairs of the corporation.'" (*quoting Sanders v. Wang*, No. 16640, 1999 WL 1044880, at *11 (Del. Ch. Nov. 10, 1999))).

Where, as here, a shareholder brings a derivative suit predicated on the board's breach of its oversight duties, the standard for determining demand futility set forth by the Delaware Supreme Court in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), applies.[5]  *See also Wood v.*

---

[5] Although we do not directly address Plaintiffs' substantive allegations, we recognize the gravamen of Plaintiffs' theory to be that the Director Defendants knew or should have known that Adolor and its officers were engaged in conduct intended to manipulate both the clinical trial process and to mislead the investing public.  In this regard, the Complaint sets forth a series of classic *Caremark* claims for director oversight liability.  In *In re Caremark International Derivative Litigation*, the Delaware Court of Chancery recognized that:

> Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only a sustained or systematic failure of the board to exercise oversight–such as an utter failure to attempt to assure a reasonable information and reporting system exists–will establish the lack of good faith that is a necessary condition to liability.

698 A.2d 959, 971 (Del. Ch. 1996); *see also id.* at 967 (noting that this theory is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment").  Plaintiffs face a significant challenge in proving their *Caremark* claims.  Because Adolor's certificate of incorporation contains a section 102(b)(7) provision, the Director Defendants are immune from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty.  In *Stone v. Ritter*, the Delaware Supreme Court

*Baum*, 953 A.2d 136, 140 (Del. 2008) ("Two tests are available to determine whether demand is

futile. The *Aronson* test applies to claims involving a contested transaction i.e., where it is

alleged that the directors made a conscious business decision in breach of their fiduciary

duties. . . . The second (*Rales*) test applies where the subject of a derivative suit is not a business

decision of the Board but rather a violation of the Board's oversight duties."). To excuse demand

under *Rales*, the court must determine "whether or not the particularized factual allegations of a

derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is

filed, the board of directors could have properly exercised its independent and disinterested

business judgment in responding to a demand." *Rales*, 634 A.2d at 934. As the Delaware Court

of Chancery explained:

> In order to create a reasonable doubt that a director is disinterested, a derivative
> plaintiff must plead particular facts to demonstrate that a director "will receive a
> personal financial benefit from a transaction that is not equally shared by the
> stockholders" or, conversely, that "a corporate decision will have a materially
> detrimental impact on a director, but not on the corporation and the stockholders."
> In these situations, a director cannot be expected to act "without being influenced by
> the . . . personal consequences" flowing from the decision. At the other end of the
> spectrum, a board member is considered to be disinterested when he or she neither

---

articulated the proper standards for evaluating whether a Board breached these duties, stating:

> We hold that *Caremark* articulates the necessary conditions predicate for director
> oversight liability: (a) the directors utterly failed to implement any reporting or
> information system or controls; *or* (b) having implemented such a system or controls,
> consciously failed to monitor or oversee its operations thus disabling themselves
> from being informed of risks or problems requiring their attention. In either case,
> imposition of liability requires a showing that the directors knew that they were not
> discharging their fiduciary obligations. Where directors fail to act in the face of a
> known duty to act, thereby demonstrating a conscious disregard for their
> responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary
> obligation in good faith.

911 A.2d at 370 (internal citations omitted).

stands to benefit financially nor suffer materially from the decision whether to pursue the claim sought in the derivative plaintiff's demand.

*In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 354 (Del. Ch. 1998) (*quoting Rales*, 634

A.2d at 936), *aff'd in part, rev'd in part sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Where a derivative complaint does not allege self-dealing,

> it is not enough to establish the interest of a director by alleging that he received any benefit not equally shared by the stockholders. Such benefit must be alleged to be material to that director. Materiality means that the alleged benefit was significant enough 'in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.

*CALPERS v. Coulter*, No. 19191, 2002 WL 31888343, at *6-7 (Del. Ch. 2002) (*quoting Orman v. Cullman*, 794 A.2d 5, 23-24 (Del. Ch. 2002)) (internal quotations omitted).

To demonstrate a lack of independence, a plaintiff must show that the directors are "beholden" to interested directors or officers, "or so under their influence that their discretion would be sterilized." *Rales*, 634 A.2d at 936 (*citing Aronson*, 473 A.2d at 815). "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. "To raise a question concerning the independence of a particular board member, a plaintiff asserting control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Orman*, 794 A.2d at 23-24 (internal quotations and citations omitted).

## A.    General Allegations Against the Board

Plaintiffs' general allegations against the members of the Board are insufficient to establish demand futility. The Complaint alleges no facts that suggests that there was "sustained

or systematic failure of the board to exercise oversight." *See In re Caremark*, 698 A.2d at 959; *see also David B. Shaev Profit Sharing Account v. Armstrong*, No. 1449-N, 2006 Del. Ch. LEXIS 33, at *15 (Del. Ch. Feb. 13, 2006) (providing non-exclusive list of potentially acceptable allegations of failure to exercise oversight, including "facts that show the company entirely lacked an audit committee or other important supervisory structures, or that a formally constituted audit committee failed to meet") (footnote omitted).  The Complaint does not allege any systematic failures or disregard for corporate governance protocols.

Likewise, the allegations that the members of the Board, as a group, are not disinterested or independent because they "participated in, approved and/or permitted the wrongs alleged [in the Complaint]" lack the particularity required to survive a motion to dismiss for failure to make demand. (Compl. ¶ 85(i).)  Ultimately, there are no specific allegations in the Complaint that differentiate the Defendant-Board members, as a group, from the board of any corporation that is the subject of securities fraud or breach of duty lawsuits.  It is well-established that the mere fact that a board was responsible for oversight at the time the alleged wrong-doing occurred is insufficient to establish demand futility. *See, e.g., Brehm*, 746 A.2d at 257 n.34 ("It is no answer to say that demand is necessarily futile because . . . the directors 'would have to sue themselves, thereby placing the conduct of the litigation in hostile hands' . . . ." (*quoting Aronson*, 473 A.2d at 817-18)).  In the absence of factual allegations establishing systemic failures of corporate oversight (e.g., failure of the audit committee to meet), the appropriate analysis here is whether there are specific allegations about individual board members that would call into question whether they are independent and disinterested.

13

**B.     Members of the Compensation Committee and Outside Directors' Receipt of Stock Options**

Plaintiffs argue that because the "the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Anido, Nash and Nelsen." (Compl. ¶ 85(b).) Conversely, Plaintiffs allege that demand on Goddard, Nash, Nickelson, Anido, Hager, Madden and Nelsen would be futile because they received stock options under Adolor's Compensation Plan, and are therefore beholden to the Compensation Committee. We address these claims together because they present both sides of the same coin.

Delaware courts have routinely rejected the argument that a director's receipt of compensation alone presents a disabling interest when determining demand futility. *See Khanna v. McMinn*, No. 20545-NC, 2006 WL 1388744, at *16 (Del. Ch. May 9, 2006) ("The mere fact that a director receives compensation for her service as a board member adds little or nothing to demand-futility analysis, 'without more'– *i.e.,* unless the pleadings demonstrate, for example, that the status or compensation was somehow 'material' to the director or otherwise outside the norm."); *In re Limited, Inc. S'holders Litig.*, No. 17148-NC, 2002 WL 537692, at *4 (Del. Ch. Mar. 27, 2002) (same). "[T]he award of options is a form of director compensation and 8 Del. C. § 141(h) provides that 'the board of directors shall have the authority to fix the compensation of directors' absent contrary provisions in the bylaws or certificate of incorporation." *Coulter*, 2002 WL 31888343, at *7 (*quoting* 8 Del. Code § 141(h)). The decision to compensate the directors with fees and stock options was voted on, and approved, by the entire Board. If the decision to pay directors, and conversely, the receipt of compensation, were enough to create a disabling

14

interest, demand would almost always be futile. This simply is not the law.[6] Therefore, we conclude that the Compensation Committee's recommendation to compensate Adolor's directors, and the receipt of compensation, do not create a disabling interest for the purposes of demand futility.

### C.      Members of the Audit Committee

Plaintiffs next allege that demand on the Audit Committee consisting of Madden, Hager, and Nickelson would be futile because the Audit Committee recommended that the Board include certain improper financial statements in Adolor's Annual Report on Form 10-K for the year ended December 31, 2003. However, as Defendants rightly point out, Plaintiffs do not make a single allegation in the entire Complaint indicating that Adolor misstated their financial statements. Instead, Plaintiffs allege only that Adolor "improperly misrepresent[ed] financial results." (Compl. ¶ 96.) Plaintiffs do not specify any particular financial results. Certainly, Adolor's public statements concerning the success or failure of the Phase III trials are not a substitute for financial statements. We see no reason why the Defendants' positions on the Audit Committee would create a disabling interest.

### D.      Defendant Peacock

---

[6] It is necessary to point out that a director's receipt of compensation, or a committee's decision to pay directors for their services as grounds for demand futility, is wholly distinguishable from a situation where the board or committee's decision to compensate their directors forms the basis of the underlying challenged transaction. *Compare Khanna*, 2006 WL 138874, at *16 (holding that receipt of directors' fees insufficient to show demand futility where receipt of compensation formed no part of underlying challenged transaction), *with Ryan v. Gifford*, No. 2213-N, 2007 WL 416162, at *7 (Del. Ch. Feb. 6, 2007) (finding demand futile where the challenged transaction centered around the compensation committee's decision to grant directors certain stock options and three of six board members served on compensation committee).

Plaintiffs argue that any demand on Peacock would be futile as a result of his position as the President and Chief Executive Officer of Adolor. We agree. The Complaint sets forth particularized allegations that, if true, raise a reasonable doubt over Peacock's ability to properly evaluate a demand on the Board. First, as President and CEO of Adolor, Peacock served as the face of the Company. He was primarily responsible for making the statements at issue, either through press releases or on conference calls with analysts. Furthermore, Peacock received substantial compensation in 2003, earning $536,202 in salary, and 150,000 stock options. Peacock's direct involvement with the Phase III trial coupled with his considerable salary and bonus plan is enough to raise a reasonable doubt about his ability to objectively entertain a demand on the Board.

### E.    Defendant Nelsen

Plaintiff alleges that demand on Nelsen would be futile because Nelsen's private investment firm, ARCH Venture Partners, sold 20,000 shares of Adolor stock for a profit of $420,420 while in possession of material non-public information concerning Entereg.[7] (Compl. ¶ 81(h)(i).) "In the context of the demand-futility inquiry, the issue is whether the trading directors could disinterestedly consider a demand by the shareholders to pursue, on behalf of the corporation, a claim charging them with insider trading on the basis of their trades." *Zimmerman v. Braddock*, No. 18473-C, 2005 WL 2266566, at *8-9 (Del. Ch. Sept. 8, 2005). A plaintiff must

---

[7] Defendants dispute the facts surrounding Nelsen's sale of Adolor shares. Although Plaintiffs would have us believe that Defendant Nelsen sold these shares of Adolor personally (*see* Compl. ¶ 81), this appears to be inaccurate. Nelsen served as managing director of ARCH Venture Partners, a private investment company that held Adolor shares in its portfolio. Contrary to Plaintiffs' contention, ARCH, not Nelsen, sold the 22,000 shares of Adolor stock for $420,420. Whether Nelsen benefitted from this sale, and what he knew when ARCH sold the shares, is unknown.

16

set forth "particularized allegations" giving rise to a "substantial likelihood" of personal liability

that raises a reasonable doubt as to the director's disinterestedness. *Rales*, 634 A.2d 936.

"Cursory allegations that director made sales of company stock in the market at a time when he

possessed material, nonpublic information are not sufficient to find a director interested for

demand-futility purposes." *In re Forest Labs.*, 450 F. Supp. 2d at 389 (*citing Guttman v. Huang*,

823 A.2d 492, 502 (Del. Ch. 2003)).  Rather, our analysis focuses on "whether plaintiffs have

pled particularized facts regarding the directors that create a sufficient likelihood of personal

liability because they have engaged in material trading activity at a time when (one can infer

from particularized pled facts that) they knew material non-public information about the

company's financial condition." *Guttman*, 823 A.2d at 502.

The Complaint contains no particularized allegations that, if true, would establish that

Nelsen was in possession of adverse nonpublic information concerning the Phase III trials.

Instead, Plaintiffs list in chronological order public statements made by Adolor's officers

concerning the Phase III trials, and allege that "[w]hile in possession of the undisclosed material

adverse information, the Insider Selling [Nelsen]" sold 22,000 shares of Adolor stock on

December 8, 2003 for $420,420.  (*See* Compl. ¶ 81.)  Plaintiffs do not indicate when, where, or

how Nelsen came into possession of this inside information.  Instead, Plaintiffs ask us to infer

that Nelsen knew of the problems with the Phase III trial simply because he was a member of

Adolor's Board. Courts have flatly rejected such generalized allegations of insider trading.  *See*

*In re Forest Labs.*, 450 F. Supp. 2d at 390 (rejecting plaintiff's demand-futility argument based

on insider trading where the "Complaint does not identify any types of reports, studies, or

analyses made available to the Board, or board meeting minutes reflecting conversations from

which the Court may infer that the Outside Directors had actual knowledge" of the alleged inside

information).[8]

Moreover, we will not infer that Nelsen had constructive knowledge of inside information

based on his position on the Board.

> While it is true that (in the securities fraud context) knowledge of facts critical to the
> continued viability of major transactions or 'core' business operations have been
> imputed to a company and its 'key' or 'top' officers, there is no authority to support
> the attribution of knowledge to Outside Directors who are not alleged to be directly
> involved in the day-to-day operations of the company.

*See id.* (internal citations omitted).  Nelsen served as an Outside Director of Adolor, and was not

an officer of the Company.  For these reasons, we conclude that demand on Nelsen would not be

futile as a result of his decision to sell 22,000 shares of Adolor.

## F.   Defendant Nash

Plaintiffs allege that demand on Nash would be futile because of his relationship with

Dougherty that developed in January 2004 when Dougherty joined the Board of Directors of

ViroPharma Inc., where Nash previously served as Chairman of the Board.  In August 2002,

ViroPharma provided clinical support to Adolor in the Phase I clinical trial in exchange for

---

[8] *See also Guttman,* 823 A.2d at 503 ("Entirely absent from the complaint are well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting regularities."); *Rattner v. Bidzos,* No. 19700, 2003 WL 22284323, at *10 (Del. Ch. Oct. 7, 2003) ("[Plaintiff] merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in) the allegedly material misstatements."); *Fink v. Komansky,* No. 03-0388, 2004 WL 2813166, at *6 (S.D.N.Y. Dec. 8, 2004) (applying Delaware law) (finding that the plaintiffs had not established that directors were interested as a result of their alleged insider trading where "[p]laintiff asserts that their membership on the Board and their positions at executive levels of Merrill Lynch provided [them] with adverse, non-public information. But, plaintiff does not state what exactly was that information").

$357,000.  Nash's connection with both ViroPharma and Dougherty creates no disabling interest on Nash's part.  "[T]o render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam v. Stewart*, 845 A.2d 1040, 1051 (Del. Ch. 2004).  "Mere allegations that [the directors in question] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes." *Id.* at 1051-52.  In the context of pre-suit demand, "friendship must be accompanied by substantially more in the nature of *serious* allegations" supporting a reasonable doubt as to independence. *Id.* at 1052 (emphasis added).  In other words, considering "the risks that directors would take by protecting their social acquaintances in the face of allegations that those friends engaged in misconduct," the Plaintiffs must create a reasonable doubt that the Director in question "would be more willing to risk his . . . reputation than risk the relationship with the interested director." *Id.*  Nash, who served as ViroPharma's Chairman, President, and Chief Executive Officer from 1994 to 2002, was no longer affiliated with ViroPharma when Dougherty joined its Board in 2004.  Further, ViroPharma played no part in the Phase III trials of Entereg, and had been paid by Adolor for its services before Dougherty joined their Board.  The mere fact that Dougherty and Nash crossed paths because of their affiliations with these companies, and more broadly, the pharmaceutical development industry, does not create a disabling interest for the purposes of demand futility.

### G.    Defendant Goddard

Plaintiffs next allege that demand on Goddard would be futile because Goddard served as

an outside consultant to Adolor beginning in 2003. In exchange for his services, Goddard received $8,500 every quarter as well as a stock option grant. In determining whether consulting fees create a disabling interest for a director, the Delaware courts have applied a subjective test, asking whether such fees were material to the Director in question. *Compare In re Walt Disney*, 731 A.2d at 357-58 (finding reasonable doubt over director's independence where his architecture firm earned millions of dollars in fees from company), *with White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000) (finding that consulting fees of $33,400 to director's firm were not so material as to taint director's judgment). It is significant that in addition to serving as a director and consultant to Adolor, Goddard is the Chairman of the Board of several other pharmaceutical companies. He served as President and CEO of Elan Pharmaceuticals until 2000, and was Chairman and Chief Executive Officer of Neurex Corporation prior to that time. Absent more specific allegations indicating how or why these consulting fees were material, we find that Goddard's consulting arrangement did not create a disabling conflict for purposes of weighing a demand on the Board.

**H.    Defendant Madden**

Plaintiff alleges that demand on Madden would be futile for two reasons. First, until March 2004, Madden was a director of Royalty Pharma AG, a private investment management firm specializing in the acquisition of royalty interests in pharmaceutical products. Adolor licenses from Eli Lilly and Company, through an assignment from Roberts Laboratories Inc., the compound that is the basis of Entereg. Under this licensing agreement, Adolor is required to pay certain royalties to Eli Lilly based on product sales. In March 2002, Eli Lilly sold the right to receive a portion of those royalties to Royalty Pharma. Secondly, in connection with Adolor's

20

public offering of 6.9 million shares in November 2003, Madden purchased 60,000 shares of Adolor stock.

We agree with Plaintiffs that under the appropriate circumstances, a director's position on another board that has significant business interests with the Defendant could create a disabling interest. However, that is not the case here because the Complaint does not allege that Adolor had direct contact with Royalty Pharma, which purchased its royalty rights from Eli Lilly. Moreoever, Plaintiffs have failed to allege the amount of royalties received in connection with Royalty Pharma's agreement with Eli Lilly. It is therefore difficult to determine whether these royalties were material to Royalty Pharma's bottom line. Finally, Madden resigned from the Board of Royalty Pharma before either the results of Study 308 were known or this litigation commenced. From a demand futility standpoint, we see no reason why Madden could not impartially consider a demand consistent with his fiduciary duties to Adolor.

We also see no reason why Madden's purchase of 60,000 shares of Adolor would create a disabling conflict of interest for demand purposes. Unlike claims of insider trading, where a defendant sells out the company based on inside information, Madden simply took advantage of a stock offering and increased his holding in Adolor. This aligned Madden's interests more, and not less, with Adolor's shareholders. Plaintiffs have provided no explanation as to how Madden's purchase rendered him unable to consider a demand on the Board, and we will not search for one.

## IV.   CONCLUSION

For the reasons set forth above, we find that Plaintiffs have failed to allege particularized facts demonstrating that demand on the Adolor Board of Directors would be futile. Accordingly,

the Complaint will be dismissed.

An appropriate Order will follow.

BY THE COURT:

R. Barclay Surrick, J.